STOP H–3 ASSOCIATION, a Hawaii non-profit corporation; Life of the Land, a Hawaii non-profit corporation, Plaintiffs,

v.

Andrew L. LEWIS, as Secretary of the United States Department of Transportation; Ralph Segawa, as Hawaii Division Engineer, Federal Highways Administration; and Ryokichi Higashionna, as Director of the Department of Transportation of the State of Hawaii, Defendants.

HUI MALAMA AINA O KO'OLAU, Plaintiff,

v.

Andrew L. LEWIS, as Secretary of the United States Department of Transportation; Ralph Segawa, as Hawaii Division Engineer, Federal Highways Administration; and Ryokichi Higashionna, as Director of the Department of Transportation of the State of Hawaii, Defendants.

Civ. Nos. 72–3606, 73–3794.

United States District Court, D. Hawaii.

April 8, 1982.

**154**

Boyce R. Brown, Jr., Honolulu, Hawaii, for plaintiffs Stop H–3 Association, et al.

Ronald Albu, Cynthia Thielen, Legal Aid Society of Hawaii, Honolulu, Hawaii, for Hui Malama Aina O Ko'Olau.

Elliot Enoki, Asst. U. S. Atty., Wallace W. Weatherwax, U. S. Atty., Honolulu, Hawaii, for Andrew L. Lewis and Ralph Segawa, Federal defendants.

Keith Y. Tanaka, Warren H. Higa, Sp. Counsel, Tobias C. Tolzmann, Honolulu, Hawaii, for Ryokichi Higashionna, Director, DOT, State of Hawaii.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL P. KING, Chief Judge.

### I. PROCEDURAL HISTORY

This is the latest chapter in the continuing saga of (T)H–3, a proposed Interstate Defense Highway which would connect the Kaneohe Marine Corps Air Station ("KMCAS") to the Pearl Harbor Naval Base and Hickam Air Force Base.[1]

Originally, the project was to extend from Halawa to Kaneohe, passing through Moanalua Valley, the Koolau mountains, and Haiku Valley. As more fully discussed below, the highway segment extending from Halawa to the Koolaus has since been realigned through North Halawa Valley.

The project has been the subject of extensive litigation. Plaintiff Stop H–3 Association filed the original complaint in Civil No. 72–3606 on July 19, 1972.[2] By injunctions entered by Stipulation and Order dated September 15, 1972 and by Decision and Order dated October 18, 1972, *Stop H–3 Ass'n v. Volpe*, 349 F.Supp. 1047 (D.Haw. 1972), this court enjoined construction and design work for the portion of the freeway connecting the Halawa and Halekou interchanges until defendants could demonstrate compliance with the National Environmental Protection Act of 1969, 42 U.S.C. § 4321 *et seq.* ("NEPA"). Two years of hearings, Environmental Impact Statement (EIS) preparation, and other legal and administrative proceedings followed.

On December 26, 1974, this court held that the defendants had complied with the applicable environmental and transportation statutes and regulations, and lifted the injunctions. *Stop H–3 Ass'n v. Brinegar*, 389 F.Supp. 1102 (D.Haw.1974). A key ruling was that since "local officials" had declared that Moanalua Valley was not historically significant, even though the U. S. Secretary of the Interior had determined that it was "likely to be eligible" for inclusion in the National Register of Historic Places, the protections of section 4(f) of the Department of Transportation Act of 1966, as amended, 49 U.S.C. § 1653(f) (1970) and section 18 of the Federal Aid Highway Act of 1968, 23 U.S.C. § 138 (1970), did not apply. These statutes, hereinafter referred to as "section 4(f)," are essentially identical.[3]

---

1. For a more complete history of the project, see this court's decision in *Stop H–3 Ass'n v. Coleman*, 389 F.Supp. 1102 (D.Haw.1974). Three alternative project configurations were considered for the North Halawa Valley. TH–3 contained six lanes, four for mixed traffic and two for transit. H–3 (the adopted alternative) contained four lanes for mixed traffic. T–3 would have been a two lane facility reserved exclusively for transit use.

2. As this litigation has progressed, the incumbent Secretary of Transportation has been substituted for his predecessor as a named defendant.

3. In relevant part, these statutes state:

It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside

On appeal, the U. S. Court of Appeals for the Ninth Circuit reversed, holding that Moanalua Valley and Pohaku ka Luahini (petroglyph rock) were entitled to the protections of section 4(f), and reinstating the injunctions until the Secretary of Transportation (the "Secretary") could demonstrate compliance therewith. *Stop H–3 Ass'n v. Coleman*, 533 F.2d 434 (9th Cir. 1976) *cert. denied*, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 610 (1976). The court declined to rule on the other three issues which had been raised on appeal, instructing the district court to reconsider them and the Secretary's 4(f) determination in the event that the Secretary did conclude that there are no "feasible and prudent" alternatives to the routing of the project through Moanalua Valley.[4] 533 F.2d at 446.

Defendants filed a Section 4(f) Statement for Moanalua Valley with the U. S. Dept. of Transportation ("DOT") in October 1976. In January 1977, the Secretary concluded that since feasible and prudent alternatives existed to the use of Moanalua Valley, he could not approve the project.

After the Secretary's decision, defendants began to prepare a supplemental EIS examining in detail the environmental effects of aligning the project through North Halawa Valley.

On August 26, 1977, defendants moved to terminate this lawsuit, arguing that since the project would no longer go through Moanalua Valley, the injunctions reimposed by the Ninth Circuit no longer applied. This court held that any freeway segment connecting the Halawa and Halekou interchanges was subject to the injunctions and denied the motion on November 17, 1977.

The Draft North Halawa Valley Supplemental EIS (Draft "NHV–SEIS") was first circulated on November 11, 1977 and public hearings were conducted on December 12, 13, 14 and 15, 1977.

On May 5, 1978, Plaintiff Stop H–3 Association filed its 68 page, twelve count, Supplemented Compilation of Complaint for Injunctive and Declaratory Relief, as Amended and Supplemented. The ninth cause of action alleged non-compliance with section 4(f) with respect to the Ho'omaluhia Recreation Project (later designated Ho'omaluhia Park). Defendants moved to dismiss this cause of action, or in the alternative, for partial summary judgment, on July 11, 1978. On November 21, 1978, this court ruled that constructive use of the recreation project triggered the protections of section 4(f), and denied the motion. Defendants subsequently prepared and circulated a 4(f) statement for Ho'omaluhia Park.

The final NHV–SEIS and Ho'omaluhia Park 4(f) Statement were processed together, and approved by the Federal Highway Administration ("FHWA") on December 10, 1980. Location and design approval for the project was given on February 5, 1981.

On April 10, 1981, the parties stipulated to the filing of plaintiffs' present 142 page, 48 count, Amended and Supplemented Complaint for Declaratory and Injunctive Relief. Defendants answered this complaint on April 20, 1981. On June 6, 1981, defendants again moved to terminate the injunctions. This motion was denied on July 7, 1981.

On September 1, 1981, the parties filed a Stipulation and Order Regarding a Plan and Schedule for Identifying Issues for Dismissal, In Limine Ruling, Summary Judgment or Trial on the Merits ("Stipulation"), pursuant to which the plaintiffs voluntarily

---

and public park and recreation lands.... [T]he Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park [or] recreation area, ... of State, or local significance ... unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possi-

ble planning to minimize harm to such park [or] recreation area....
23 U.S.C. § 138; 49 U.S.C. § 1653(f).

4. The court need not consider these claims except to the extent that the plaintiffs have reasserted them in their latest Amended Complaint.

dismissed their sixth, seventh, ninth and twelfth causes of action.[5]

On September 9, 1981, plaintiffs moved for leave to amend their eighth cause of action and to add a forty-ninth cause of action. The court granted their motion as to the eighth cause of action on September 16, 1981 and as to the forty-ninth cause of action on October 14, 1981. During trial, the court permitted plaintiffs to amend their twenty-seventh and forty-ninth causes of action to conform to the evidence.

Prior to trial, the court granted defendants' unopposed motion for summary judgment as to the fourth, fifth, nineteenth and twenty-first causes of action. The court also granted defendants' motions for summary judgment as to the eighth (as amended) and thirteenth causes of action.[6]

On October 23, 1981, the court granted defendants' motion to dismiss the twenty-second and forty-seventh causes of action.[7]

On September 30, 1981, the court granted plaintiff Hui Malama Aina O Ko'olau's ("Hui Malama's") Motion for Summary Judgment as to the twenty-fifth cause of action, and ordered defendants to initiate formal biological consultation with the U.S. Fish and Wildlife Service ("USFWS") regarding the *Achatinella* [Hawaiian Tree Snail], in accordance with section 7(a)(2) of the Endangered Species Act of 1973, 16 U.S.C. § 1536(a)(2), and its associated regulations, 50 C.F.R. § 402.04 (1980). Defendants complied with this order on October 2, 1981. On October 29, 1981, the USFWS issued a formal biological opinion stating that constructing H–3 through North Halawa Valley would not endanger the *Achatinella.*

## II. CURRENT POSTURE

Trial on Defendants' Motion to Terminate the Injunctions and Plaintiffs' Complaint for Injunctive and Declaratory Relief took place from October 14 to October 29, 1981. During closing arguments, Defendants moved for reconsideration of this court's determination that section 4(f) applied to Ho'omaluhia Park.

On November 4, 1981, Plaintiffs moved for summary judgment as to the thirty-fourth cause of action. Since the parties introduced evidence with respect to this cause of action and argued the issue at trial, summary judgment is inappropriate. Accordingly, the issue will be considered together with the other causes of action.

This court must now consider the adequacy and validity of: (1) the 1972 Moanalua Valley EIS ("1972 EIS") and 1973 Supplemental EIS ("1973 Preface") as of their approval date; (2) the NHV–SEIS; (3) the Pali Golf Course 4(f) determination; and (4) the Ho'omaluhia Park 4(f) determination.[8]

## III. ISSUES

The remaining thirty-eight causes of action fall into ten broad categories, as follows (with their associated issues):[9]

---

5. These causes of action were:
   6. NEPA—Failure to comply with NEPA requirement of consultation before EIS prepared in final form.
   7. NEPA—Failure to comply with DOT Regs re: public availability of EIS 30 days before hearing.
   9. NEPA—Failure to comply with CEQ Regs re: list of preparers in EIS.
   12. NEPA—Failure to comply with 23 C.F.R. § 771.14—who participates and who signs off.

6. The fourth, fifth, nineteenth and twenty-first causes of action involved the defendants' alleged failure to consult with the Army Corps of Engineers and the City & County of Honolulu Board of Water Supply. The eighth cause of action alleged that the decision to approve the EIS was made before the end of the comment period. The thirteenth cause of action asserted that defendants discouraged comments and failed to distribute the EIS for comments.

7. These causes of action alleged that the decision to approve the EIS and Ho'omaluhia 4(f) statement were based upon political considerations. Plaintiffs introduced no evidence as to these matters at trial.

8. The 1972 EIS, 1973 Preface and NHV–SEIS together constitute the "EIS" for the North Halawa Valley alignment of the project.

9. Briefly summarized, the remaining causes of action are:
   1. NEPA—Reliance on Outmoded/Stale Studies.

*A. NHV–SEIS Preparation.*

1. Whether defendants improperly delegated preparation of the NHV–SEIS to private consultants (Counts Ten and Eleven).

2. Whether defendants failed to circulate the NHV–SEIS to and obtain and defer to comments from the Board of Water Supply of the City and County of Honolulu (Count Three).

*B. EIS Adequacy.*

Whether the EIS is inadequate because it:

2. NEPA—Failure to Supplement EIS to Reflect Change from 6 lanes to 4 lanes & Likelike Busway.

3. NEPA—Failure to circulate EIS to and obtain and defer to Board of Water Supply comments.

10. NEPA—Failure to comply with CEQ Regs. and NEPA wrongful delegation of EIS preparation.

11. NEPA—Failure to comply with 23 C.F.R. § 771.7. Non-disclosure of conflict of interest.

14. NEPA—Failure to comply with 23 C.F.R. § 771.15 and 40 C.F.R. Parts 1500–1508 re: need for Supplemental EIS addressing change from 6 to 4 lanes, Likelike busway and passenger transfer facilities.

15. NEPA—Failure to comply with CEQ Regs. Need for highway based on false assumption that highway needed to meet growth.

16. NEPA—Failure to comply with CEQ Regs & NEPA—EIS contains inadequate examination of secondary impacts.

17. NEPA—Failure to comply with CEQ Regs & NEPA—OMEGA Station.

18. NEPA—Failure to comply with CEQ Regs & NEPA—EIS is a justification, not an examination.

20. NEPA—Failure to comply with CEQ Regs. Failure to recirculate Draft after acquiring significant new information.

23. NEPA—Decision approving project was arbitrary and capricious.

24. OMB Circular A–95.

26. Endangered Species Act—Oahu Creeper.

27. Endangered Species Act—*Cyrtandra.*

28. Endangered Species—I'iwi (Part 195D, Haw.Rev.Stat.)

29. Public Hearings—Selection of North Halawa Valley before hearings.

30. Public Hearings—Combined Hearings wrong.

31. Public Hearings—Design Hearing held before corridor approved.

1. Relies on outmoded and stale studies (Count One).

2. Fails to address the inconsistency of the project with the Oahu General Plan (Count Thirty-five).

3. Fails to adequately deal with socioeconomic impacts of the project (Counts Sixteen and Thirty-three);

4. Is based upon inaccurate population assumptions. (Count Fifteen).

5. Fails to disclose the impact of the U.S. Coast Guard OMEGA transmitting station upon construction workers and freeway users (Count Seventeen);

32. Public Hearings & Approval—Design approval given without proper design hearing.

33. Study Report—Required reports not submitted. No report on social disruption.

34. Public Hearings & Approval—Evidence of NEPA and 4(f) compliance not submitted with approval request.

35. General Plan—H–3 in conflict with General Plan. Conflict not reconciled.

36. 4(f)—Ho'omaluhia—4(f) statement not circulated properly.

37. 4(f)—Ho'omaluhia—4(f) statement approval based on insufficient information.

38. 4(f)—Ho'omaluhia—Failure to include non-highway alternatives.

39. 4(f)—Ho'omaluhia—Failure to coordinate 4(f) statement with Army Corps of Engineers.

40. 4(f)—Ho'omaluhia—Failure to disclose conflict of interest.

41. 4(f)—Ho'omaluhia—Failure to conduct all possible planning to minimize harm to the park before 4(f) approval.

42. 4(f)—Ho'omaluhia—Inadequate contents of 4(f) statement.

43. 4(f)—Ho'omaluhia—Failure to demonstrate that no feasible and prudent alternative exists.

44. 4(f)—Ho'omaluhia—Wrongful rejection of feasible and prudent alternative—*Mauka Realignment.*

45. 4(f)—Ho'omaluhia—Wrongful rejection of feasible and prudent alternative—*Makai Realignment.*

46. 4(f)—Ho'omaluhia—Wrongful rejection of feasible and prudent alternative—*No Build.*

48. 4(f)—Pali Golf Course—4(f) statement inadequate; wrong conclusion of no feasible and prudent alternative.

49. CZMA—Failure to comply with coordination provisions.

6. Is a justification for rather than an examination of the project (Count Eighteen).

### C. Further Supplemental EIS (Counts Two, Fourteen and Twenty).

Whether Defendants are required to prepare an additional Supplemental EIS to reflect:

1. Uncirculated studies concerning H–3's environmental aspects;

2. The terms upon which the Secretary's approval of the NHV–SEIS were conditioned; or

3. The applicability of section 4(f) to Ho'omaluhia Park.

### D. Project Approval.

Whether the Secretary's decision to pursue a "build" alternative was arbitrary and capricious (Count Twenty-three).

### E. Location and Design Approval.

Whether location and design approval for the North Halawa Valley alignment of the project was invalid because:

1. The defendants were committed to the North Halawa Valley corridor prior to the public hearings (Count Twenty-nine);

2. Location and design hearings were improperly held (Counts Thirty, Thirty-one and Thirty-two);

3. The design/location study reports for the project were inadequate (Count Thirty-three).

4. The design/location study reports were untimely filed (Count Thirty-four).

### F. OMB Circular A–95 Compliance.

Whether defendants complied with the coordination process prescribed by OMB Circular A–95 (Count Twenty-four).

### G. Endangered Species.

1. Whether defendants violated the Endangered Species Act with respect to the Oahu Creeper (Count Twenty-six);

2. Whether defendants violated the Endangered Species Act with respect to the Cyrtandra (Count Twenty-seven, as amended).

3. Whether constructing H–3 through North Halawa Valley would violate the Hawaii Endangered Species Act, Chapter 195D, Haw.Rev.Stat., by "taking" the I'iwi (Count Twenty-eight).

### H. Coastal Zone Management.

Whether defendants have complied with the Coastal Zone Management Act of 1972, 16 U.S.C. § 1451 et seq. (the "CZMA"), and its implementing regulations, codified at 15 C.F.R. part 930 (1981) (Count Forty-nine, as amended).

### I. Section 4(f)—Ho'omaluhia Park.

1. Whether the 4(f) statutes apply to Ho'omaluhia Park (Defendants' Motion for Reconsideration).

2. Whether defendants improperly delegated preparation of the Ho'omaluhia Park 4(f) Statement (Count Forty).

3. Whether defendants failed to coordinate preparation of the 4(f) statement with the agency having jurisdiction over the Park, as required by 23 C.F.R. § 771.-19(g)(5) (1980) (Count Thirty-nine).

4. Whether the 4(f) Statement was properly circulated (Count Thirty-six).

5. Whether the 4(f) Statement is inadequate because it fails to:

a. Contain the information required by 23 C.F.R. § 771.19(i) (1980) (Count Forty-two);

b. Discuss non-highway alternatives (Count Thirty-eight).

6. Whether the Secretary's approval of the 4(f) Statement was based upon adequate information regarding non-highway alternatives (Count Thirty-seven).

7. Whether the Secretary properly concluded that no feasible and prudent alternatives exist to the use of the park (Counts Forty-three, Forty-four, Forty-five and Forty-six); and

8. Whether the 4(f) statement is deficient because it fails to demonstrate that all possible planning to minimize harm to the park has been done (Count Forty-one).

*J. Section 4(f)—Pali Golf Course.*

Whether the Secretary's section 4(f) determination for the Pali Golf Course was proper (Count Forty-eight).

## IV. STANDARD OF REVIEW

This court's role in evaluating compliance with the requirements of NEPA is narrowly limited. As stated in *Save Lake Washington .v. Frank*, 641 F.2d 1330 (9th Cir. 1981),

> Judicial review of an EIS covers only the issue of whether NEPA's procedural requirements have been met, and whether the EIS performs its primary task of presenting the decision-maker with an environmentally-informed choice. The correct standard is provided in the Administrative Procedure Act, 5 U.S.C. § 706(2)(D), which directs courts to set aside an agency action if taken "without observance of procedure required by law . . ." [citations omitted]

*Id.* at 1334.

■ A court is not to substitute its judgment for that of the agency as to the environmental consequences of its action. Rather, the court must ensure that the agency has taken a "hard look" at environmental factors. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976); *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585, 592 (9th Cir. 1981).

If the agency has followed the proper procedures, its action will only be set aside if the court finds the action to be "arbitrary and capricious," given the known environmental consequences. *See Columbia Basin Land Protection Ass'n*, 643 F.2d at 596; *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 552 (9th Cir. 1977) (per curiam) ("*Warm Springs Dam I*").

The court should not be used as a quasi-legislative or quasi-executive forum by those who are dissatisfied with policy decisions made by governing bodies.[10] The environmental laws were neither meant to be used as a "crutch" for chronic fault-finding, nor as a means of delaying the implementation of properly approved projects.

■ Moreover, an EIS will be found to be adequate if it was prepared in good faith and contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences. *Columbia Basin Land Protection Ass'n*, 643 F.2d at 592; *see Lathan v. Brinegar*, 506 F.2d 677, 693 (9th Cir. 1974) (courts are not permitted to "flyspeck" environmental impact statements).

■ The extent of judicial scrutiny of the Secretary's 4(f) determination is prescribed by *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1970). In order for the 4(f) determination to have been proper, the Secretary must have (1) properly construed his authority to approve the use of parkland as limited to situations where there are no feasible alternative routes or where feasible alternative routes involve uniquely difficult problems; (2) reasonably believed that such a situation exists in the case at hand; (3) based his decision upon a consideration of the relevant factors; and (4) not made a clear error of judgment. *Id.* at 416, 91 S.Ct. at 823. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Id.*

■ Finally, the burden of proof is on the plaintiffs to establish that the EIS is inadequate or that the Secretary acted improperly in approving the use of parklands. *Monroe County Conservation Council v. Ad-*

**10.** One is reminded of the three fundamental rules of planning:

1. Let's make a park out of the other fellow's lot.

2. Let's tighten up the building restrictions—after I've finished my building.

3. Let's raise the gangplank—now that I've landed.

*ams,* 566 F.2d 419, 422 (2d Cir. 1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1977).

## V. DISCUSSION

In order to evaluate Defendants' compliance with NEPA, the Court must first determine which version of the Council on Environmental Quality regulations (CEQ Regs.) is applicable.[11] 40 C.F.R. § 1506.12 (1980) states in relevant part:

> (a) These regulations shall apply to the fullest extent practicable to on-going activities and environmental documents begun before the effective date. *These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective date of these regulations.* No completed environmental documents need be redone by reasons of these regulations. Until these regulations are applicable, the Council's guidelines published in the *Federal Register* of August 1, 1973, shall continue to be applicable. In cases where these regulations are applicable the guidelines are superseded. However, nothing shall prevent an agency from proceeding under these regulations at an earlier time. [emphasis added]

Since the effective date of the regulations is November 30, 1979, and the draft NHV–SEIS was filed in 1977, it appears that the environmental documents prepared to date should be evaluated in accordance with the 1973 CEQ guidelines.[12] However, any further documentation ordered by this court should be prepared in accordance with the 1979 Regulations.

### A. NHV–SEIS Preparation.

#### 1. Delegation of EIS Preparation.[13]

■ 23 C.F.R. § 771.7 (1980) permits consultants to be used in the preparation of environmental impact statements.[14] Plaintiffs allege that to the extent this regulation permits delegation of EIS preparation to other than a State agency or official, it is contrary to 42 U.S.C. § 4332(2)(C) (1975 amendment to NEPA) and invalid.

Plaintiffs' arguments for invalidating the regulation are unpersuasive. It appears from the legislative history of the 1975 amendment to NEPA (Public Law 94–83) that the section permitting delegation of EIS preparation to State agencies was add-

---

**11.** The 1973 CEQ Guidelines were supplanted by the CEQ Regulations adopted November 29, 1978, 43 Fed.Reg. 55990; codified at 40 C.F.R. parts 1500–1508.

**12.** 40 C.F.R. § 1506.12 (1978) states in relevant part:
The effective date of these regulations is July 30, 1979, except that for agencies that administer programs that qualify under sec. 102(2)(D) of the Act ... an additional four months shall be allowed for the State or local agencies to adopt their implementing procedures.
The FHWA was one of the agencies allowed the additional four months.

**13.** This cause of action was submitted for the court to determine the following issues:
(a) Is 23 C.F.R. § 771.7 (1980) invalid as being contrary to 42 U.S.C. § 4332(2)(C) (1975 amendment to NEPA) to the extent that the regulation permits delegation of EIS preparation to other than a State agency or official?
(b) If 23 C.F.R. § 771.7 is valid and if, therefore, it is permissible for an EIS to be prepared by a consultant in the manner described in the text, is it permissible for the H–3 EIS to have been prepared by a consultant which has a financial interest in seeing that H–3 is built?
(c) If it is permissible for the H–3 EIS to be prepared by a financially interested consultant in the manner described, is it permissible to not disclose in the EIS either the manner of EIS preparation or the fact that the consultant is financially interested?

**14.** 23 C.F.R. § 771.7 (1974) states in relevant part:
*Use of consultants.*
(a) Consultants may be utilized in preparing all types of environmental studies and reports. The responsibility for formulating all conclusions and determinations shall remain with the HA and FHWA.
(b) Work by consultants on environmental studies and reports leading to a project decision should be carefully reviewed to insure that complete and objective consideration is given to all relevant project impacts and alternatives. This is particularly important when the same consultants may be involved in subsequent phases of the highway section development.

ed to resolve the split in case law which had developed. The issue of consultants was not addressed. It does not appear that Congress intended to prohibit the delegation of EIS preparation to private consultants. I conclude that the regulation is neither contrary to NEPA nor invalid. *See Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1973).

This court has previously decided the question of whether preparation of an EIS may be delegated to a financially interested consultant.

> NEPA does not prevent the employment of a private contractor who has a financial interest in the project to draft an EIS. NEPA does require that the final EIS be sufficiently reviewed and considered by the "responsible official" to insure that it was a part of the decision making process.

*Life of the Land v. Brinegar,* 363 F.Supp. 1171, 1175 (D.Haw.1972), *aff'd* 485 F.2d 460 (9th Cir. 1973), *cert. denied* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

■■■ Testimony at trial established that the consultants, Parsons Brinkerhoff Hirota Associates ("Parsons") prepared the first draft of the NHV–SEIS and submitted it to the State and Federal Agencies for comments and revisions. This process was repeated until the draft was in final form. The FHWA was involved with the preparation of the EIS on an almost daily basis. I find that the FHWA was sufficiently involved in the preparation of the EIS to comply with the requirements of the regulations. *See Essex County Preservation*

*Ass'n v. Campbell,* 536 F.2d 956 (1st Cir. 1976). Finally, I find that under the circumstances, the consultants' financial interest in the outcome of the project need not be disclosed in the EIS. It is sufficient that this interest was known to the agencies responsible for the EIS.

On October 30, 1981, the FHWA adopted a completely revised version of 23 C.F.R. part 771. The new regulations limit the role of private institutions or firms to providing environmental studies and commenting on environmental documents.[15] However, the new regulations also provide that:

> FEIS's accepted by the administration prior to July 30, 1981, whose drafts were filed with the Environmental Protection Agency (EPA) prior to July 30, 1979 (for FHWA November 30, 1979), may be developed in accordance with the regulations in effect at the time the draft document was filed.

23 C.F.R. § 771.109(a)(4) (1981).

Since the original draft EIS (Moanalua) was filed with the EPA in 1972, and the Draft NHV–SEIS was filed in 1977, defendants properly applied the older regulations in preparing the NHV–SEIS and Ho'omaluhia Park 4(f) Statement. However, the role that consultants may play in the preparation of any new documentation ordered by this Court will be constrained by the requirements of the new regulations.

**2. Board of Water Supply.[16]**

■■■ NEPA requires that copies of the EIS and the comments and views of the

---

**15.** 23 C.F.R. § 771.109(c)(4) (1981) states in relevant part:

(4) *Other.* In all other cases the role of the applicant is limited to providing environmental studies and commenting on environmental documents. All private institutions or firms are limited to this role.

**16.** The parties submitted this issue on stipulated facts for the Court to decide the following questions:

(a) Is the Board of Water Supply a local agency which is authorized "to develop and enforce environmental standards" within the meaning of 42 U.S.C. § 4332(2)(A) and (C)?

(b) Does 42 U.S.C. § 4332(2)(A) and (C) require the State D.O.T. to defer to the expertise of the Board of Water Supply or only require the State D.O.T. to obtain comments from the Board of Water Supply, and if the Defendants are required to defer to the Board of Water Supply, did they do so?

(c) If so, is it permissible for defendants to obtain the comments and view of the Board of Water Supply and not include them in the EIS?

(d) If the comments are required to be included in the North Halawa Valley EIS, is what was included in the NHV–SEIS sufficient to satisfy the statutory requirements?

appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, be made available to the public and accompany a proposal through the agency review processes. 42 U.S.C. § 4332(2)(C).

Plaintiffs contend that this statute required the Defendants to (1) obtain and defer to comments from the City and County of Honolulu Board of Water Supply (the "Board of Water Supply"); and (2) recirculate the Final NHV–SEIS with comments to the public.

Since NEPA only requires consultation with *Federal* agencies having expertise with respect to any environmental impact involved, Defendants were not required to defer to the comments of the Board of Water Supply, a *local* agency. Nevertheless, it is clear from the testimony and other evidence adduced at trial that the Defendants did circulate the NHV–SEIS to and obtain comments from the Board of Water Supply, and that the concerns of the Board of Water Supply were resolved.[17] Finally, NEPA does not require that a Final EIS, with comments, must be recirculated to the public.

## B. EIS Adequacy.

### 1. Outmoded or Stale Studies.

▪ Plaintiffs allege that the EIS, as a whole, is inadequate because it relies upon

(e) Does 42 U.S.C. § 4332(2)(A) and (C) require that the Final NHV–EIS with comments be recirculated to the public?

17. Any remaining doubts as to the project's potential groundwater impacts are alleviated by the following condition to the Secretary's concurrence in the EIS:

That the final design be coordinated with the Honolulu Board of Water Supply to assure that groundwater impacts are avoided and that coordination with the Board will continue throughout construction of the project. If any conditions are encountered during construction which would significantly threaten the Honolulu Water Supply, construction will stop until a solution acceptable to the Board of Water Supply is agreed upon.
OST Concurrence Memorandum at 2.

studies conducted between nine and fourteen years ago.

It is a sad fact of environmental litigation that the EIS approval process can stretch over many years. To hold that studies become invalid merely because of the passage of time would expand this time horizon to infinity. While it is true that circumstances may change over time, such changes can best be handled through the supplementation process prescribed by section 1502.9 of the CEQ Regs., 40 C.F.R. § 1502.9 (1980). Except for portions of the 1973 EDAW socio-economic impact study, discussed below, plaintiffs have failed to demonstrate that any of the studies contained in the 1972 EIS or 1973 Preface are no longer valid.

### 2. Consistency with the 1977 Oahu General Plan.

▪ The regulations of both the DOT and CEQ require that an EIS discuss the relationship between the proposed action and the land use plans of the affected community.[18] Where conflicts or inconsistencies exist, the EIS "should describe the extent of reconciliation and the reason for proceeding notwithstanding the absence of full reconciliation." 23 C.F.R. § 771.18(h) (1978); 40 C.F.R. § 1500.8(a)(2) (1978).

On January 18, 1977, the City and County of Honolulu adopted a revised Oahu General Plan, which became law on February 2,

18. 40 C.F.R. § 1500.8(a)(2) (1978) states in relevant part:
(a) The following points are to be covered:
(2) The relationship of the proposed action to land use plans, policies, and controls for the affected area. This requires a discussion of how the proposed action may conform or conflict with the objectives and specific terms of approved or proposed Federal, State, and local land use plans, policies and controls, if any, for the area affected .... Where a conflict or inconsistency exists, the statement should describe the extent to which the agency has reconciled its proposed action with the plan, policy or control, and the reasons why the agency has decided to proceed notwithstanding the absence of full reconciliation.
23 C.F.R. § 771.18(h) (1980) is similarly worded.

1977.[19] Plaintiffs allege that H–3 is inconsistent with the population and transportation objectives and policies of this plan, and that these inconsistencies are not resolved in the EIS.

It should initially be noted that the H–3 project has been under consideration by Federal, state and local officials for many years. Copies of the NHV–SEIS were circulated to the Oahu Metropolitan Planning Organization (the State/City Cooperating agency), the City and County of Honolulu Department of General Planning and Department of Land Utilization ("DLU") and several other local agencies, none of which have raised any legal challenges to the project. While it is true that the DLU did express a number of concerns as to the consistency of the project with the General Plan, these comments were responded to by the defendants. These comments and re-

sponses are reprinted in Vol. VII of the NHV–SEIS at pp. 192–197.

While not conclusive, the failure of the responsible officials to raise any further objections to the project raises an inference that the defendants could reasonably have believed that the project was consistent with the General Plan.

The relationship between H–3 and the General Plan Objectives and Policies is described in Vol. I of the NHV–SEIS at pp. 100–110. It is important to recall that the relevant standard of review is whether this discussion reasonably addresses the pertinent issues. I only decide whether the agency could *reasonably* reach the conclusions that it did, not whether those conclusions were *in fact* correct.

Policies three, seven, nine and ten of Transportation Objective "A" encourage the development and use of public transportation on the island of Oahu.[20] *See* 1977

---

**19.** The 1977 General Plan discusses the implementation process and the relationship between the General Plan, Development Plans and zoning ordinances as follows:

By itself, the General Plan cannot bring about all of the changes and improvements which the City and County government considers to be desirable and attainable. It is, by design, a very general document; and one of its purposes is to establish a coherent set of broad guidelines which can be used in drawing up an islandwide set of Development Plans.

Development Plans, according to the Revised Charter of 1973, are relatively detailed guidelines for the physical development of the Island. They are an intermediate means of implementing the objectives and policies of the General Plan in the various parts of the Island and, as such, are meant to incorporate the provisions for land-use planning which were central to the old General Plan. They are also meant to indicate the sequence in which development will occur.

Development Plans will contain 'statements of standards and principles' with respect to land uses for residential, recreational, agricultural, commercial, industrial, and institutional purposes and with respect to open spaces. In addition, they will contain 'statements of urban-design principles and controls.' They should not, however, be confused with the existing Development Plans, which are basically plans for the improvement of streets and public utilities. Nor should they be confused with zoning ordinances. Zoning ordinances will continue to regulate the use of and within clearly demar-

cated zones and set detailed standards for the height, bulk, size, and location of buildings.

The new Development Plans will be prepared by the City and County government with the participation of the people of Oahu. Although their focus will be somewhat different than that for the new General Plan—individual areas rather than the whole of the Island of Oahu—and although their range will be shorter than that of the General Plan, they must nonetheless be fully consistent with the objectives and policies of the General Plan.

General Plan at 14.

The Development Plan for the area in question has not yet been adopted.

The Revised Charter of the City and County of Honolulu requires that the General Plan be reviewed every five years. This review process is presently taking place.

**20.** These policies are:

3. Provide transportation services for people living outside the Pearl City—Hawaii Kai Corridor primarily through a system of express- and feeder-buses and limited to moderate highway improvements.

7. Promote the use of public transportation as a means of moving people quickly and efficiently, of conserving energy, and guiding urban development.

9. Promote programs to reduce dependence on the use of automobiles.

10. Discourage the inefficient use of the private automobile, especially in congested corridors and during peak-hours.

Oahu General Plan at 39–40 (hereinafter cited as "General Plan").

Although the NHV–SEIS only directly discusses the public transportation policies in relation to the (T)H–3 alternative, *see* NHV–SEIS vol. I at 107–109, I find that this issue is adequately addressed in the NHV–SEIS. It is true that this discussion would have been less subject to challenge had the (T)H–3 alternative been approved, but I find that defendants could reasonably have believed that H–3 is consistent with the Transportation Policies of the General Plan.

Population Objective "C" of the General Plan establishes the desired Oahu population distribution for the year 2000.[21] The General Plan envisions limited growth on the Windward side of Oahu. If Policy 4 of Population Objective "C" is met, Windward side population will increase in absolute terms, but decrease as a percentage of the total Oahu population from 16.4% in 1975 to 14.4%, plus or minus 0.7%, in 2000. *See* Oahu General Plan at 21.

The population objectives and policies of the General Plan are thoroughly laid out and discussed at pp. 100–104 of the NHV–SEIS.

Defendants assert that H–3 is not inconsistent with these objectives and policies because the highway will not have any long-term growth impacts.

Land use and development on the windward side of Oahu is currently controlled by the State Land Use District Boundaries and the Oahu General Plan, Development Plans, and zoning ordinances. Given these plans and their continued implementation, *the H–3 facility will not, in and of itself, induce population growth and further development of windward Oahu.* The Preface to the Final Environmental Impact Statement (pp. 5–1 to 5–12) does however indicate that, initially, construction of the H–3 facility could accelerate the rate of development on windward Oahu. Thereafter population growth would level off. In any case, *land use densities on windward Oahu can only reach the maximum allowable under the General Plan and Comprehensive Zoning Code with or without H–3.* With H–3, these densities may or may not be reached earlier. [emphasis added]

NHV–SEIS Vol. I at 127.

The court's role is not that of a "super-planner" to determine the correctness of this assertion. It is sufficient to pass judicial review that the EIS considered the issue and came to a reasoned conclusion. Challenges to assumptions and conclusions are most appropriately handled through the EIS commenting process.[22]

### 3. Socio-Economic Impacts.

NEPA, 40 C.F.R. § 1500.8(a)(3)(ii) (1978) and 23 C.F.R. § 771.18(i)(1) (1980), require that an EIS assess and discuss the secondary (socio-economic) effects of a project.[23] To date, the only socio-economic

---

21. The percentage of total population allocated to the various areas is a mean or average figure rather than a rigid requirement. A year 2000 percentage which falls within 5% of the indicated mean for an area would be consistent with the Plan's population-distribution policy. General Plan at 21.

22. It should be noted that defendants apparently assume that the zoning ordinances will be amended to conform with the General Plan. Present zoning on the Windward side will accommodate a population of approximately 157,000, far more than the year 2000 target population of 125,700 to 138,500. However, since the Development Plans must be consistent with the objectives and policies of the General Plan, it is reasonable to assume that the City and County will act advisedly in amending the appropriate zoning ordinances.

23. 40 C.F.R. § 1500.8(a)(3)(ii) states in relevant part:

Secondary or indirect, as well as primary or direct, consequences for the environment should be included in the analysis. .... For example, the effects of the proposed action on population and growth may be among the more significant secondary effects. Such population and growth impacts should be estimated if expected to be significant ... and an assessment made of the effect of any possible change in population patterns or growth upon the resource base, including land use, water, and public services, of the area in question.

impact study commissioned by the Defendants was the 1973 EDAW study reprinted at pages 211–281 of Appendix "B" of the 1973 Preface.[24] In 1974, I held that this study, in conjunction with the other discussions of socio-economic effects contained in the 1972 EIS and 1973 Preface, constituted adequate consideration of secondary impacts. *Stop H–3 Ass'n v. Brinegar*, 389 F.Supp. at 1111. Plaintiffs have not persuaded me that this decision was incorrect.

A socio-economic assessment does not have to take the form of a formal "study" and need not be all encompassing. The adequacy of the assessment is governed by a "rule of reason". Conclusions and recommendations may be based upon extrapolations from empirical data, as well as upon the data itself. Although the 1973 EDAW study focused upon the area expected to feel the greatest effects from the implementation of the project, it also considered impacts outside of the study area.

> While it is apparent that the area of potential impacts may well range wider than the study area as defined above, it also appears that the primary socio-economic concerns rest mainly in the study area. Potential Route H–3 impacts in the balance of the Koolaupoko (windward) district would be less severe, in terms of impacts of degree rather than kinds, and could be characterized principally as "more of the same". Potential Route H–3 impacts on the Koolauloa District, further north of the study area, would be of the same kind and nature as impacts within the study area but far less severe due to the mitigating effects of distance.

1973 Preface, exhibit "B" at 229.

Thus, although the study only dealt directly with a relatively small portion of the affected region, the discussion of socio-economic impacts was sufficient to meet the requirements of law.

As noted above in part V.B.2., the 1977 Oahu General Plan significantly altered the planned population distribution for the island of Oahu. The Leeward side of the island will be developed into a secondary urban center, while growth on the Windward side will be limited. Plaintiffs contend that the 1973 EDAW study must be supplemented to reflect this change.

It is obvious that the portion of the EDAW study which dealt with the effects of the 1969 General Plan is no longer valid. A more difficult question is whether the adoption of the new general plan invalidates the remainder of the study. I find that it does not. Most of the study addresses growth impacts in general terms. Further, the NHV–SEIS extensively discusses the project's secondary impacts in light of the planning changes which have occurred. *See, e.g.*, NHV–SEIS Vol. I at 118–129. Finally, plaintiffs have failed to demonstrate that conditions have changed so much that population growth will have significantly different effects than those described in the EDAW study.

*City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975), heavily relied upon by plaintiffs in support of their contention that defendants cannot attribute growth impacts to the General Plan rather than the highway, is readily distinguishable from the case at hand.

In *City of Davis*, the City itself challenged the construction of a freeway interchange designed to stimulate and service future industrial development in the neighboring Kidwell area. Davis and the Kidwell area were in different counties. Expert opinions and studies that Davis introduced during the litigation showed that such development could place severe demands upon and contaminate Davis' water supply, disrupt the City's policy of controlled growth, and increase demand for city services without providing a corresponding increase in the city's tax base. Defendants attempted to justify their failure to prepare an EIS on the basis of a three-page "Negative Declaration of Envi-

---

24. This study, entitled "H–3 Socio-Economic Study—The Effects of Change on a Windward Oahu Rural Community", was prepared by the consulting firm of Eckbo, Dean, Austin & Williams on December 14, 1973.

ronmental Impact," which concluded that the project would have no significant adverse environmental effects. The Negative Declaration did not consider any of the project's possible impacts upon Davis. Similarly, the Design Study Report submitted to the FHWA dismissed secondary effects as "speculative" and "uncertain". The court found that although the nature and extent of development which the project will induce is uncertain, it was unreasonable for the defendants to conclude, *without further study*, that the environmental impact of the proposed interchange would be insignificant. *See id.* at 675.

In the case at hand, a socio-economic assessment was made and included in a properly circulated EIS. Further, Honolulu is in the rather unique position of having a single statement of long-range social, economic, environmental and design objectives for the entire island. Thus, unlike the situation in *City of Davis*, conflicting growth and development plans for adjoining areas are resolved by a single body. Finally, as previously noted, the City and County of Honolulu has not raised any legal challenges to the EIS or the project itself.

I find that it was reasonable for the defendants to assume that construction of H–3 will not adversely affect the City's efforts to implement the General Plan and that the discussion of socio-economic impacts was sufficient to meet the requirements of NEPA.

### 4. Population Assumptions.

■ 40 C.F.R. § 1500.8(a)(1) (1978) requires agencies to *identify* the population and growth characteristics of the area affected by its action and the population and growth assumptions used to justify the project or program or to determine secondary impacts resulting therefrom.[25]

The population figures used in the General Plan, and consequently in the NHV–

SEIS, were derived from the "Series E–2" population projections issued by the State Department of Planning and Economic Development ("DPED") in 1974 to promote uniformity and consistency in Federal, state, county, and private planning work. Oahu population was forecast to reach 1,039,000 by the year 2000. Applying the General Plan distribution percentages to this figure yielded a target Windward side population of between 142,300 and 156,900. However, as stated in the General Plan,

> The figure of 1,039,000 for the year 2000 and the corresponding distribution of the population to the various designated areas ... will be revised as the State Department of Planning and Economic Development ["DPED"] revises its population projections.

General Plan at 21.

On March 1, 1978, the DPED issued a new set of projections, designated "II–F", designed to refine and update the E–2 series. Projected year 2000 Oahu population was revised downwards from 1,039,000 to 917,400. Applying the General Plan distribution percentages to this new figure yields a target Windward side population of between 125,700 and 138,500. It should be noted, however, that the Series E–2 and II–F projections only forecast *total* Oahu population and do not provide regional breakdowns.

All of the population projections used in developing the traffic projections for the H–3 corridor were derived from the Series E–2 population projections. The NHV–SEIS fails to discuss the series II–F projections, even though they were issued nearly two years before the NHV–SEIS was approved. .

The Route H–3 Travel Demand Analysis assumed a Windward side population of 150,000, based upon the series E–2 projections. This assumption was reconsidered by the FHWA in light of the Series II–F pro-

---

**25.** 40 C.F.R. § 1500.8(a)(1) (1978) states in relevant part:

Agencies should also take care to identify, as appropriate, population and growth characteristics of the affected area and any popula-

tion and growth assumptions used to justify the project or program or to determine secondary population and growth impacts resulting from the proposed action and its alternatives . . . .

jections. *See* FHWA Region 9 Staff Analysis, App. "B". The FHWA apparently concluded that the General Plan population distribution goals would not be met, and decided that based upon a year 2000 Oahu population of 917,400, it was appropriate to continue to use a Windward population of 150,000 in its travel demand analysis.

Defendants' apparent assumption that the General Plan goals will not be met and year 2000 Windward side population will be approximately 150,000 may be correct. However, this assumption contradicts defendants' assertion that growth will be limited by the General Plan. It would have been wiser for the FHWA to have considered whether the project would still be viable if General Plan population goals are met. Nonetheless, I find that defendants did meet their responsibility of *identifying* the population and growth assumptions used to justify the project.

### 5. The OMEGA Station.

The U.S. Coast Guard operates an OMEGA Navigation Station in Haiku Valley. The transmitting antenna consists of six insulated spans which extend across the valley and are fed at the center by a multi-conductor downlead system connected to the transmitter building. The antenna ground system consists of a dense network of copper conductors extending radially outward from the transmitter building for a distance of 1100 feet. Strong electric and magnetic fields exist in the region between the antenna and the ground system.

As originally planned, the Windward viaduct of the project would largely have avoided the ground system. Because the location of the trans-Koolau tunnel portal in Haiku Valley had been determined based upon the location of H–3 in Moanalua Valley, the corridor shift to North Halawa Valley increased the tunnel length from just under 5,000 feet to over 8,400 feet. During the preliminary investigations and design of the North Halawa Valley alignment, it was determined that the required tunnel length (and hence construction costs) could be reduced significantly by shifting the location of the Haiku portal and lengthening the Windward viaduct, but that such a shift would require that a portion of the Windward viaduct pass directly over the ground system.

In late 1977, Defendants contacted the Coast Guard to pursue the concept of H–3 and OMEGA collocation. Continued coordination with the Coast Guard led to a study which was conducted by the electronics consulting firm of Kershner & Wright. The study was primarily concerned with the effects of the proposed viaduct upon the OMEGA Station, although it also dealt with the effects of the transmitter upon the highway and its users. The consultants considered two alignments of the Windward Viaduct, the original configuration (Alignment "A") and the proposed change (Alignment "B").

The first phase of the study concluded that the highway could be constructed and operated without reducing the effectiveness of the OMEGA station, and that the hazards involved in the construction and operation of the highway could be controlled or maintained at negligible levels. NHV–SEIS Vol. VI, appendix "M" at 26. This conclusion applied to both alignments. *Id.* Phase II of the study dealt with the technical modifications necessary to maintain the performance of the ground system and the antenna.

As a result of the studies, the proposal was modified to reflect the adoption of Alignment "B". This change is discussed in Vol. I of the Final NHV–SEIS at pp. xxxvi–xxxix. Copies of both reports were included as Appendix "M" in Vol. VI of the NHV–SEIS, but were never circulated to the public, ostensibly because they were prepared too late to be included in the Draft NHV–SEIS.

Plaintiffs allege that the reports (1) are substantively inadequate and (2) contain "new and significant" information that must be circulated to the public in the form of a supplemental EIS. In particular, plaintiffs challenge the report's discussion of the potential hazards of the OMEGA Station's electromagnetic radiation upon

heart pacemaker wearers, construction workers and highway users.

■ Mere disagreements among experts will not invalidate an EIS. *Life of the Land v. Brinegar*, 485 F.2d 460, 472 (9th Cir. 1973), *cert. denied*, 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974); *Kentucky ex rel. Beshear v. Alexander*, 655 F.2d 714, 720 (6th Cir. 1981). An expert opinion contrary to that expressed in an EIS should be submitted to the agency responsible for the EIS for consideration as "new and significant" information. A court cannot be expected to decide the relative merits of conflicting expert opinions.

■ Although a plaintiff cannot quibble with the assumptions and conclusions made by an expert within his area of expertise, he may attempt to demonstrate that the author of a study was incompetent to address particular issues. By his own admission, the preparer of the report in question was not an expert on biological effects of electromagnetic radiation. On the other hand, he was qualified to conclude, as he did, that through proper shielding techniques, the electric field strength in the vicinity of the highway could be reduced to negligible levels. I find that the studies and the discussion of H–3/OMEGA Collocation contained in the Final NHV–SEIS would have been sufficient to meet the requirements of NEPA had the proper procedures been followed. The safety concerns raised by plaintiff are not sufficient to invalidate the reports. Defendants have a responsibility to consider this information if it is presented to them. However, that examination process is outside of the scope of this lawsuit.

It is undisputed that the information contained in the studies is "new". However, defendants contend that since the electric field strength can be reduced to "safe" levels, the new information is not "significant", citing *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir. 1980) ("*Warm Springs Dam II*"). I find that their reliance is misplaced. In that case, information about a potentially serious earthquake hazard came to the attention of the Corps of Engineers after the publication of a supplemental EIS. The study in question challenged a basic design assumption for a proposed dam. The Corps considered the information, conducted an extensive study of their own, and concluded that their original assumptions were correct. The court found that the Corps' decision not to prepare and circulate a supplemental EIS reflecting the issues raised by the study was reasonable.

Here, the highway design must take the OMEGA Station electric field effects into consideration. This fact alone demonstrates that the information is significant. Further, the trans-Koolau tunnel alignment was altered as a result of the studies. The situation here thus differs from that in *Warm Springs Dam II*, where the new information did not necessitate any changes in the project.

6. Justification vs. Examination. ·

■ The purpose of an EIS is to serve as the means of assessing the environmental impact of proposed agency actions, rather than as a justification for decisions already made. *See* 40 C.F.R. § 1500.7(a) (1978). Plaintiffs allege that defendants violated this regulation because the 1972 EIS, 1973 Preface, Moanalua Valley 4(f) Statement, and 1977 NHV–SEIS were prepared not as a means of assessing the environmental impact of H–3, but rather as justifications for prior decisions to build the project through the designated valleys. I find no merit to this contention.

The fact that an agency prefers one alternative over another does not violate NEPA. What is important is that the decision to proceed with the action not be made until the EIS process has been completed. The facts are clear that events followed the required sequence in this case.

C. *Further Supplemental EIS.*

■ A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions. *Warm Springs Dam II* at 1023; *see* 42 U.S.C. §§ 4332(2)(A), (B).

Pursuant to 40 C.F.R. § 1502.9(c)(4) (1980) and 23 C.F.R. § 771.15 (1980), the FHWA is required to prepare a supplemental EIS when (1) changes are made in the proposed action that will introduce a new or changed environmental effect of significance to the quality of the human environment, or (2) significant new information becomes available concerning the action's environmental aspects. A supplemental EIS is to be processed in the same manner as a new EIS (draft and final). The supplementation process applies to both draft and final EISs.[26] Thus, if significant new information becomes available while an EIS is in draft form, the draft must either be recirculated or supplemented. It is not sufficient that the new information is incorporated into the final EIS.

■ An agency's decision not to supplement an EIS in light of new information will be upheld if reasonable. *Warm Springs Dam II*, 621 F.2d at 1024.

When new information comes to light the agency must consider it, evaluate it, and make a reasoned determination whether it is of such significance as to require implementation of formal NEPA filing procedures. Reasonableness depends on such factors as the environmental significance of the new information, the probable accuracy of the information, the degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data.

*Id.*

1. Uncirculated Studies.

Vol. VI of the NHV–SEIS contains a number of studies, none of which were circulated to the public. Plaintiffs contend that these studies contain significant new information which must be reflected in a supplemental EIS.

As discussed in part V.B.5., *supra*, I find that the H–3/OMEGA Station Collocation Studies contain "new and significant" information. Although collocation was discussed in the Final NHV–SEIS, defendants failure to circulate the information in draft EIS form necessitates the preparation of a further supplemental EIS.

■ I find that none of the other studies are "new and significant". It should first be noted that NEPA does not require that supporting studies be physically attached to the EIS. It is sufficient if they are available and accessible. *Coalition for Canyon Preservation v. Bowers*, 632 F.2d 774 at 782 (9th Cir. 1980); *Trout Unlimited v. Morton*, 509 F.2d 1276 at 1284 (9th Cir. 1974). Thus, the studies themselves need not be circulated as a supplemental EIS, provided that their findings are discussed and referenced in a properly circulated supplemental EIS.

While it is true that Dr. Robert Schallenberger's 1978 Avifaunal study, NHV–SEIS Vol. VI, appendix "K", did provide additional information regarding the avian population and habitat of the Central Ko'olau Range, it was reasonable for defendants to conclude that this study did not provide significant new information concerning the project's environmental effects. At defendants' direction, Dr. Schallenberger had conducted two prior avifaunal surveys of North Halawa Valley. The results of these surveys were incorporated into an extensive discussion of the effects of the project upon the bird life in the valley. *See* NHV–SEIS Vol. I at 165–70. These studies concluded

---

**26.** 23 C.F.R. § 771.15 states:

A *draft EIS* or final EIS may be supplemented at any time. Supplements will be necessary when substantial changes are made in the proposed action that will introduce a new or changed environmental effect of significance to the quality of the human environment or significant new information becomes available concerning the action's environmental aspects. The decision to pre-

pare and process a supplement to the final EIS shall not void or alter FHWA approval actions given prior to the decision, or void or alter previously authorized development of the highway section not directly affected by the changed condition or new information. A supplement is to be processed in the same manner as a new EIS (draft and final). [emphasis added]

that H–3 would have a significant adverse impact upon such life. The 1978 study merely reinforced this conclusion.

■ In consonance with DOT's urban transportation policy, FHWA Region 9 re-examined the H–3 proposal to insure that the alternatives involving the rehabilitation of existing highways were given adequate consideration. The study, referred to as the "Region 9 Staff Analysis", covered 16 different alternatives, including contra-flow bus lanes, banning of trucks during peak hours, and one-way operation of either Likelike Highway or Pali Highway during peak hours.

The Region 9 Staff Analysis contained a detailed cost-benefit analysis of the different alternatives. The fact that the Secretary's selection of the H–3 alternative instead of the recommended (T)H–3 alternative was largely based upon the results of the cost-benefit analysis indicates the significance of this information. I therefore conclude that the Region 9 Staff Analysis also is "new and significant" information within the meaning of the relevant regulations.

2. Terms of Approval.

■ One of the terms upon which the Secretary's concurrence in the EIS was conditioned was:

That the project include all FHWA recommendations—construction of a 4-lane H–3; *implementation of a one lane reversible bus lane on the Likelike*; provision for passenger transfer facilities at the Likelike Highway and the H–3 interchange in conjunction with the proposed Honolulu Area Rapid Transit System; and further study of transportation system mananagement [*sic*] measures, including peak hour prohibition of trucks on the Likelike and Pali Highways. [emphasis added]

Office of the Secretary Concurrence Memorandum (Nov. 21, 1980).

Plaintiffs contend that a supplemental EIS must be prepared to reflect the required implementation of the reversible bus lane, provision for passenger transfer facilities, and the approval of the 4-lane H–3 alternative.

The FHWA interpreted the condition requiring implementation of the reversible bus lane to mean that the standard highway development process for the bus lane will proceed simultaneously with the design and ultimate construction of H–3. The correctness of this interpretation was confirmed by the Director of the Office of Environment and Safety. There was testimony at trial that a project which undergoes the standard development process will not necessarily be constructed. It thus appears that the highway and the bus lane are separate projects. While it is certainly possible that an EIS for the bus lane may ultimately be necessary, the environmental effects of the bus lane need not be considered in the H–3 EIS.

An EIS need not be supplemented merely because an alternative other than the one preferred by the preparer is selected. Indeed, one of the purposes of an EIS is to help a decision maker to choose among competing proposals. I find that since the 4-lane H–3 alternative was adequately discussed in the NHV–SEIS, a further supplemental EIS reflecting the selection of that alternative is not required.

3. Ho'omaluhia Park.

■ As more fully discussed in part V.I., *infra*, the area surrounding the Kaneohe Flood Control Project was developed into a major regional park (Ho'omaluhia) after the windward alignment of the project was established and the 1972 EIS and 1973 Preface had been prepared. Pursuant to this court's order of November 21, 1978, Defendants prepared a 4(f) statement addressing alternatives to the proposed constructive use of the park. This statement did not undergo the normal EIS circulation process.

I find that the development of Ho'omaluhia Park and the project's potential impacts upon it are new and significant information which must be reflected in a supplemental EIS.

*D. Project Approval.*

Plaintiffs contend a comparison of the projected construction costs and environmental and socio-economic impacts of H–3 with the expected benefits from the project renders the selection of other than a no-build alternative arbitrary and capricious and a clear error in judgment.

As noted above, judicial review under NEPA is very narrow. A court may require an agency to follow procedural requirements of NEPA and *consider* environmental factors, but cannot determine the weight to be accorded such factors. As long as a decision is based upon legitimate considerations, it cannot be set aside as "arbitrary and capricious". *See Columbia Basin Land Protection Ass'n*, 643 F.2d at 596.

As stated in *Strykers' Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 62 L.Ed.2d 433 (1979) (per curiam),

> *Vermont Yankee* [*Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)] cuts sharply against the Court of Appeals' conclusion that an agency, in selecting a course of action, must elevate environmental concerns over other appropriate considerations. On the contrary, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot " 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' " [citations omitted]

*Id.* at 227, 100 S.Ct. at 500.

Defendants have demonstrated the need for an improvement in trans-Koolau transportation. Whether I would have balanced the competing interests in the same manner or reached the same conclusion as did the Secretary is immaterial. I cannot set aside his determination if it was based on legitimate considerations. However, because the defendants have violated the procedural requirements of NEPA and the CEQ and DOT regulations by failing to prepare a supplemental EIS addressing the new and significant information, I must set aside the Secretary's decision on procedural grounds and need not reach the substantive issue. Had the new information become available after the approval of the NHV–SEIS, potential relief would at best have been limited to requiring the Secretary to reconsider his decision in light of the new information.

*E. Location and Design Approval.*

1. Prior Commitment.

Plaintiffs have failed to establish that the defendants were impermissibly "committed" to the North Halawa Valley corridor prior to the H–3 corridor hearings of December 1977. Further, it is doubtful that such a commitment would in itself constitute a violation of the DOT Regs.

The first H–3 corridor studies took place in 1965. The trans-Koolau corridors were re-examined in detail during the preparation of and hearings for the 1972 EIS. These studies and hearings removed from further consideration the Manoa Valley, Nuuanu Valley, Kalihi Valley and South Halawa Valley corridors. The Secretary's 1976 determination that there existed feasible and prudent alternatives to Moanalua Valley eliminated that corridor from consideration. The only remaining trans-Koolau corridor was North Halawa Valley. The alternate corridors were again reexamined prior to the preparation of the NHV–SEIS. There has been no serious suggestion that any of these corridors are viable alternatives to North Halawa Valley or that their prior rejection should be reconsidered. It would thus be absurd to require defendants to hold further hearings as to their desirability.

2. Combined hearings.[27]

The relevant facts are not in dispute. Defendants held combined corridor and design hearings as to the H–3 North Halawa

---

**27.** These causes of action were submitted for the court to determine the following issues:

(a) Were the combined corridor and design hearings held in 1977 were held in violation of the applicable regulations and statutes?

Valley (NHV) alignment of December 12–15, 1977. Simultaneous location and design approval was given on February 3, 1981. The issue before this court is whether the defendants properly combined the corridor and design hearings for the H–3 NHV alignment.

A key issue with regards to these causes of action is the meaning of "project". Plaintiffs suggest that the individual sections of the highway, e.g., the Halekou interchange, Windward viaduct and trans-Koolau tunnels be considered as separate "projects", since separate construction contracts will be let for each of them. Such a restrictive definition is contrary to the intent of the relevant statutes.[28]

■ A highway connecting two logical termini may be considered a single project for planning purposes, even though the construction phase may be broken down into several separate contracts. *See Lathan v. Brinegar*, 506 F.2d 677 (9th Cir. 1974).

■ With respect to location approval, this court has previously held that the H–3 "project" encompasses the entire highway connecting the Halawa and Halekou interchanges.

[W]hatever administrative convenience may be served by dividing the proposed highway into segments, for purposes of public hearings it is one project. Construction of the Leeward segment up to the Koolau Mountains makes no sense without the Windward segment up to the other side of the Koolau Mountains, and neither segment makes sense unless both are connected by a tunnel through the mountains.

Statement of Facts Conclusions of Law and Order, July 13, 1973. Further, in the Order Interpreting Injunction issued April 21, 1981, this court ruled that the NHV and Moanalua Valley alignments of H–3 were alternate routings of the same project.

23 C.F.R. § 790.5(g) (1980) permits combined corridor and design hearings to be held for projects which have had prior public hearings.[29] Public hearings were held for the Moanalua alignment of the project. It was therefore proper for defendants to combine the corridor and design hearings for the NHV alignment. Since a valid design hearing was held, design approval was not improper on the grounds asserted in this cause of action.

### 3. Adequacy of Study Reports.

■ A request for location or design approval must be accompanied by reports

---

(b) If it was a violation of applicable regulations and statutes to hold combined location and design hearings, is the proper remedy to invalidate corridor approval and order new separate corridor and design public hearings?

**28.** 23 C.F.R. § 1.2 (1980) states in relevant part:
(a) Terms defined in 23 U.S.C. 101(a) shall have the same meaning where used in the regulations in this part, except as modified herein.
(b) The following terms where used in this part shall have the following meaning:
. . . .
*Project.* An undertaking by a state highway department for highway construction, including preliminary engineering, acquisition of rights-of-way and actual construction, or for highway planning and research, or for any other work or activity to carry out the provisions of the Federal laws for the administration of Federal aid for highways.

**29.** Although the regulations contemplate that a design public hearing will be held *after* the route location has been approved, *see* 23 C.F.R. § 790.3(b) (1980), 23 C.F.R. § 790.5(g) (1980) states:
(g) With respect to any project for which a public hearing has been held under Federal-aid procedures, and for which it is determined by the State highway department and the Division Administrator that a new hearing is desirable to consider supplemental information on social, economic, or environmental effects relative to proposals presented at a previous public hearing to with respect to additional proposals, then, as appropriate, a new corridor or design hearing should be held. When recommended by the State and approved by the Division Administrator, *a new corridor hearing held in accordance with this section may be combined with the design hearing, whether or not a design hearing for the project has been previously held.* In such instances, the location shall be reconsidered and a new request for location approval shall be submitted together with the request for design approval. [emphasis added]

and other documents which, *inter alia*, discuss the anticipated economic, social, and environmental effects of the proposed action and alternatives under consideration. 23 C.F.R. §§ 790.9(c), 790.8(b)(2)(i) (1980). The H–3 Location/Design Study Report, NHV–SEIS, 1973 Preface and 1972 EIS were submitted as evidence of compliance with this requirement. Plaintiffs challenge the adequacy of these reports with respect to socio-economic impacts and infrastructure availability.

As more fully discussed in part V.B.3., *supra*, the EIS adequately discusses the socio-economic impacts of the project. Similarly, I find that defendants reasonably concluded that the extensive planning process for Oahu in general and the windward side in particular will insure that future infrastructure requirements will be met.

4. Timeliness of Study Report Filing.

■ Location and design approval is governed by 23 C.F.R. part 790 (1980). If location or design approval is not requested within three years after the date of the respective hearings, new hearings must be held. 23 C.F.R. §§ 790.5(d), (e) (1980).

Location/Design hearings were held from December 12–15, 1977. Location/Design approval was requested on December 10, 1980. Although the reports and studies analyzing the project were somewhere within the FHWA bureaucracy on the date of the request, they did not arrive at FHWA Region 9 Office (the office where the request for approval was filed) until between two and five days after the three-year time period for requesting approval had lapsed. The decision to proceed with the project was not made until all of the required documents had been submitted.

The stipulated question for this cause of action is whether the applicable regulations require that the appropriate documentation *physically* accompany a request for location/design approval, or whether it is sufficient that such documentation may be found as of the day of the request somewhere in the FHWA bureaucracy.

To hold that the three year period during which location or design approval may be requested is tolled only when all of the documents supporting the request are physically present in the particular FHWA office where the request is filed would inject a needless technical requirement into an already complex process. I conclude that it is sufficient that the documents are in the hands of and have been previously reviewed by the FHWA at the time of the request.

*F. OMB Circular A–95 Compliance.*

Office of Management and Budget ("OMB") Circular A–95 (revised), 41 Fed. Reg. 2052 (Jan. 13, 1976), provides for coordination between Federal, state and local agencies with respect to Federal and federally assisted projects.

23 C.F.R. part 420, subpart C, implements the regulations in OMB Circular A–95 with respect to FHWA and Urban Mass Transit Administration ("UMTA") projects. 23 C.F.R. part 450, subpart A, defines the relationship between state Metropolitan Planning Organizations ("MPOs") and state A–95 coordinating agencies. I find that the Defendants have complied with the above-described coordination requirements.

*G. Endangered Species.*

1. The Oahu Creeper.

■ This cause of action raises two legal issues: (1) whether or not the biological opinion issued by the USFWS regarding the impact of the H–3 project upon the Oahu Creeper was inadequate or otherwise improper as a matter of law and (2) whether defendants are under a legal obligation to continue the biological consultation process with the USFWS.

As an initial matter, the USFWS is not a party to this lawsuit, so even if the biological opinion had been legally erroneous, this court would not have the power to force the USFWS to reconsider its decision or reinitiate consultation. Nevertheless, defendants have demonstrated that they have met their initial consultation responsibilities under the Endangered Species Act.

On September 11, 1978, the USFWS issued a formal biological opinion, pursuant to section 7(b) of the Endangered Species Act, that the H–3 project was not likely to jeopardize the continued existence of the Oahu Creeper. Plaintiffs contend that this opinion was "arbitrary, capricious, an abuse of discretion, a clear error in judgment and otherwise not in accordance with law." Complaint ¶ 355 at 74.

50 C.F.R. § 402.04 (1980) governs the consultation process under the Endangered Species Act. Plaintiffs do not allege, nor do I find, that defendants violated the procedural requirements of this regulation. Rather, plaintiffs argue that the conclusion reached by the USFWS was clearly erroneous and based upon inadequate information.

The facts do not support either of these contentions. The USFWS biological opinion was based upon Dr. Robert Schallenberger's 1978 Avifaunal Study, NHV–SEIS vol. VI app. K. The study took place from December 1977 through February 1978. During this period, only one positive and two possible sightings of the Oahu Creeper occurred in the North Halawa Valley. While it is true that conditions for bird sighting were suboptimal at the time of the survey, it cannot be concluded that *as a matter of law* the survey data was insufficient to support a biological opinion or that the conclusion drawn from the data was clearly erroneous. Based upon the survey, the USFWS could reasonably have concluded that the H–3 project is not likely to jeopardize the existence of the Oahu Creeper.

Even a biological opinion based upon inadequate information would not have been per se invalid. In the case of an incomplete opinion rendered upon inadequate information, the law merely imposes upon the Federal agency the continuing obligation to make a *reasonable* effort to develop that information. *North Slope Borough v. Andrus*, 486 F.Supp. 332, 352 (D.D.C.1979), *mod. on other grounds*, 642 F.2d 589 (D.C. Cir.1980); H.Conf.Rep. No. 96–697, 96th Cong., 1st Sess., *reprinted in* [1979] U.S. Code Cong. & Ad.News 2557, 2576; 50 C.F.R. § 402.04(f).

The issue of data adequacy was decided by the USFWS when it issued its formal biological opinion. It may be true that the decision was not clear-cut, but this court must defer to the reasonable conclusion stated in the biological opinion letter:

In essence, we have very little data for providing an opinion but feel it would be *unreasonable* to request a study which would be unlikely to provide definitive results. [emphasis added]

Pursuant to 50 C.F.R. § 402.04(e), once the USFWS has issued its biological opinion, no further consultation is *required*. In their request for formal consultation regarding the *Achatinella*, Defendants inquired of the USFWS whether further consultation was required. By letter dated October 7, 1981, the USFWS responded that no further consultation was necessary.

2. The *Cyrtandra*.

Section 7(c)(1) of the Endangered Species Act states in relevant part:

To facilitate compliance with the requirements of this section, each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on *November 10, 1978*, request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action [a "section 7(c) species list"]. [emphasis added]

16 U.S.C. § 1536(c)(1) (as amended 1978).

Defendants did not make such a request until October 2, 1981.

Plaintiffs contend that if a timely request for the Section 7(c) species list had been made, then (1) defendants would have been apprised that new species of the *Cyrtandra* may exist in North Halawa Valley; (2) defendants would have discovered these new species; and (3) these species would have been placed on the Section 7(c) species list.

With respect to this cause of action, Plaintiffs urge the court to block development of H-3 until the defendants have completed formal biological consultation with the USFWS, addressing the new species of the *Cyrtandra*, pursuant to sections 7(a) and (b) of the Endangered Species Act.

It is undisputed that the new species of *Cyrtandra* are neither listed nor proposed to be listed as endangered species. Formal consultation addressing these species is thus clearly not required under the ESA. Further, it is doubtful that the provision underlying this cause of action is even applicable to defendants, since it only applies to agency action for which no contract for construction has been entered into and for which no construction has begun on November 10, 1978. As noted before, construction of the H-3 project (the Halawa and Halekou interchanges) began in 1972.

3. The I'iwi.

■ The I'iwi [a Hawaiian bird] is considered endangered on Oahu. It is not considered endangered on any of the other islands in this state, nor is it listed as an endangered species by the USFWS. Plaintiffs contend that constructing H-3 through the North Halawa Valley will destroy the habitat of the I'iwi, thereby "taking" it in violation of Haw.Rev.Stat., Chapter 195D.[30]

The enforcement provision of Haw.Rev. Stat., Chapter 195D states that:

Any employee or agent of the department upon whom the board of land and natural resources has conferred powers of police officers, including the power to serve and execute warrants and arrest offenders or issue citations throughout the State, and any police officer of the counties of this State shall have the au-

thority to enforce any of the provisions of this chapter or any regulation or rule promulgated pursuant hereto.

§ 159D-7 [sic], Haw.Rev.Stat.

Since the statute contains a specific enforcement provision, I conclude that a private right of action does not exist.[31] Further, an injunction would be an inappropriate remedy even if Plaintiffs did have a private right of action, since § 195D-9, Haw.Rev.Stat., provides *criminal* sanctions for violation of the chapter.

Finally, even if a private right of action did exist, it does not appear that constructing H-3 through North Halawa Valley will "take" the I'iwi. As defined in § 195D-2(j), "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect endangered species of wildlife ... or to attempt to engage in any such conduct". Destruction of habitat is not covered by the statute.

*H. Coastal Zone Management.*

Pursuant to the Coastal Zone Management Act of 1972, as amended, 16 U.S.C. § 1451 *et seq.*, and its implementing regulations, 15 C.F.R. part 930 (1981), Federal agencies are required to conduct their activities in a manner consistent with state CZM programs.

Agency actions are divided into four categories: (1) Federal Activities, 15 C.F.R. part 930C; (2) Activities Requiring a Federal License or Permit, 15 C.F.R. part 930D; (3) Outer Continental Shelf Exploration, Development and Production Activities, 15 C.F.R. part 930E; and (4) Federal Assistance to State and Local Governments, 15 C.F.R. part 930F.

---

**30.** Haw.Rev.Stat. § 195D-4(e) states in relevant part:

Prohibited acts. With respect to any endangered species of wildlife or plant, it is unlawful, ..., for any person subject to the jurisdiction of this State to:

(2) Take any such species within this State;

**31.** In relevant part, Haw.Const. art. XI, § 9 states:

Any person may enforce this right [to a clean and healthful environment] against any party, public or private, through appropriate legal proceedings, *subject to reasonable limitations and regulation as provided by law.* [emphasis added]

Plaintiffs argue that this provision entitles them to a private right of action. I find that it does not.

H–3 falls into category (4), Federal Assistance. *See* Procedures Guide for Achieving Federal Consistency with the Hawaii Coastal Zone Management Program, at exh. "B". I find that Defendants have fully complied with the requirements of the CZM statutes and regulations. Plaintiffs' other contentions with respect to this cause of action are without merit.

## I. *Section 4(f)—Ho'omaluhia Park.*

Background.

Ho'omaluhia Park began as a flood control project developed by the Army Corps of Engineers. Between 1966 and 1970, when the flood control project was authorized, the concept of the park was expanded from approximately 35 acres of "green-belt" surrounding the flood-control dam and reservoir, to 75 acres. In 1973, the proposed park was further expanded to 115 acres, taking into consideration the planned windward alignment of H–3. A 115 acre area between the park and the highway was to act as a "buffer zone" between the two projects. This area was subsequently purchased by the City and County and incorporated into the project, making the boundary of the park contiguous with the proposed highway right-of-way. A master plan for the park was adopted in February, 1974. The plan restricted all of the park's intensive uses, *i.e.*, camping and picnicking, to the interior 115 acres of the park. The intensive use area is isolated from the highway by a peripheral park circulation road and a low density recreational use zone (primarily trails and open space).

### 1. Motion to Reconsider.

Defendants contend that since the park boundaries were determined after the freeway alignment was established, the protections of 4(f) should not apply. Their argument is not without merit. As noted above, the park design took into account the potential impacts of the freeway. In addition, the flood-control reservoir was sized to accommodate the inflow of sediment resulting from the construction of the highway, and landscaping and other measures are planned to visually shield the park from the highway. Defendants also argue that to extend the coverage of the 4(f) statutes to include parks which are planned concurrently with highways would discourage the development of such parks.

While defendants' arguments are intuitively appealing, their position is contrary to the explicit statutory mandate that the Secretary not approve *any* program or project which requires the use of parkland unless the provisions of the 4(f) statutes are complied with.

The 4(f) statutes were enacted to prevent public parks from being converted into masses of concrete and asphalt. As stated in *Overton Park*, 401 U.S. at 412, 91 S.Ct. at 821.

[T]he very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. [footnotes omitted]

*Id.*

More specifically,

These statutes prohibit the Secretary of Transportation from authorizing the use of federal funds to finance the construction of highways through public parks if a "feasible and prudent" alternative route exists. If no such route is available, the statutes allow him to approve construction through parks only if there has been all possible planning to minimize harm" to the park. [footnotes omitted]

*Id.* at 405, 91 S.Ct. at 817.

The statutory protections of 4(f) have been judicially extended to include constructive use as well as physical taking of parkland. *See, e.g., Brooks v. Volpe*, 460 F.2d 1193 (9th Cir. 1972).

Constructive use is not an easily defined concept. The fact that traffic noise can be heard or that a highway can be seen from a park does not necessarily mean that the

park is being "used" by the highway. The degree or existence of constructive use depends upon both the nature of the park and the degree of impacts from the highway. For example, a park circulation road or parking lot would be much less affected by highway noise than would a picnic area or campsite. Mitigation measures such as landscaping and noise barriers may reduce the impact of a highway sufficiently to eliminate park "use". However, absent strict application of the 4(f) statutes, highway departments would have no incentive to take such measures, especially where it would be costly to implement them. Application of section 4(f) is thus appropriate in this case.

The fact that a park and a highway are jointly developed may be sufficient to establish that there are no feasible and prudent alternatives to the use of such park. At the very least, joint development should simplify efforts to minimize harm to the park.[32] However, for the reasons stated above, defendants' Motion to Reconsider is denied.

### 2. Delegation.

For the reasons stated in the section discussing delegation of the preparation of the EIS, *supra*, I hold that preparation of the Ho'omaluhia Park 4(f) statement was not improperly delegated.

### 3. Coordination.

■ The following facts with regards to this cause of action are not disputed: (1) Ho'omaluhia Park was developed by the Corps of Engineers in conjunction with its Keapuka flood control project; (2) during this period, the Corps of Engineers had control of the park property; (3) in May, 1981, the Corps of Engineers turned over control of the park property to the City and County of Honolulu; (4) coordination of the 4(f) statement occurred prior to May, 1981; (5) the 4(f) statement was coordinated with the City and County of Honolulu, and not with the Corps of Engineers; (6) throughout the relevant period, the City and County of Honolulu has held fee title to the Park property; and (7) the City and County of Honolulu presently operates and manages the Park.

The legal issues are: (1) whether defendants were required to coordinate the 4(f) statement with the Corps of Engineers; and (2) if so, whether the violation may be excused by a showing of good faith and lack of prejudicial effect.

23 C.F.R. § 771.19(g)(1) (1980) requires that "[t]he section 4(f) involvement must be coordinated with the agency having jurisdiction over the 4(f) lands." Plaintiffs contend that the Corps of Engineers had either exclusive or joint jurisdiction over the Ho'omaluhia property while the 4(f) statement was being prepared. Defendants' submit alternatively that (1) as fee owner and ultimate manager and operator of the Park, the City and County was the *sole* agency with jurisdiction over the property; or that (2) since the regulation only refers to coordination with *the* agency having jurisdiction over the property, it was reasonable for them to coordinate the 4(f) statement with only the *primary* agency having jurisdiction, the City and County.

The Corps of Engineers developed the park pursuant to a contract with the City and County of Honolulu. Although the Corps of Engineers handled the design and construction work for the project, the City and County held ultimate control, as evidenced by their successive decisions to enlarge the project. Indeed, it was the City

---

**32.** To a degree, this problem is alleviated by the DOT regulations. 23 C.F.R. § 771.135(g) (1981) states in relevant part:

Designations of park and recreation lands ... are sometimes made and determinations of significance changed late in the development of a proposed action. [A]n action may proceed without consideration under section 4(f) if the property interest in the section 4(f)

type lands was acquired for transportation purposes prior to the designation or change in the determination of significance and if an adequate effort was made to identify properties protected by section 4(f) prior to project approval.

The earlier version of this regulation, 23 C.F.R. § 771.19(g) (1980), was similarly, although less restrictively worded.

and County's decision to extend the Park boundaries to the edge of the H–3 right-of-way that triggered the protections of section 4(f). Clearly, the City and County was "the agency having jurisdiction" of the property, and coordination of the 4(f) statement with them was therefore proper.[33]

#### 4. Circulation.

██ The issues raised by this cause of action are (1) whether the applicable regulations permitted Defendants to circulate the Ho'omaluhia 4(f) statement separately from the NHV–SEIS; and (2) if so, whether the 4(f) statement should have been circulated in the form and manner of a supplemental EIS.

Under ordinary circumstances, a 4(f) statement will be prepared and circulated with the corresponding project EIS. However, 23 C.F.R. § 771.19(g)(8)(i) (1980) provides for separate circulation of the 4(f) information when "[t]he section 4(f) area is designated after the . . . final EIS is processed."

Since the final Moanalua EIS was approved in 1974 and it was not determined that a 4(f) statement was required for Ho'omaluhia Park until 1978, it follows that separate circulation of the 4(f) statement was proper.

23 C.F.R. § 771.19(g)(8) does not specify the manner in which a separate 4(f) statement is to be circulated. Defendants contend that since the final 4(f) statement was processed in conjunction with the Final NHV–SEIS, then either as a matter of law or as a reasonable interpretation of the applicable regulations, it was sufficient that the 4(f) statement was only circulated to the agencies with whom the FHWA was required to coordinate preparation of the statement.

Defendants' contention is not without merit. However, where, as here, a project's involvement with 4(f) lands is sufficient to constitute "new and significant informa-

tion" requiring the preparation of a supplemental EIS, see discussion under part V.C.3., supra, the 4(f) statement must be circulated as a supplemental EIS. This manner of circulation is clearly contemplated by the regulations. See 23 C.F.R. § 771.19(g)(5) (1980).

#### 5. Adequacy.

██ Plaintiffs contend that the Ho'omaluhia 4(f) statement is inadequate because it fails to contain all of the information required by 23 C.F.R. § 771.19(i) (1980). The forty-second cause of action recites a litany of items which allegedly are not addressed by the 4(f) statement.

It is true that the 4(f) statement could have contained more information. However, the same can be said of any environmental document. Further, much of the omitted information will only be available once the design of the highway is finalized. Accordingly, I find that the Ho'omaluhia 4(f) statement contains sufficient information to comply with 23 C.F.R. § 771.19(i).

The thirty-eighth cause of action alleges that the Ho'omaluhia 4(f) statement is inadequate because it fails to sufficiently address non-highway alternatives to the construction of H–3. This contention is without merit. A 4(f) statement need not reiterate in detail the reasons why a highway is necessary. As is the case here, it is sufficient that the non-highway (no-build) alternatives are adequately addressed in the EIS or other documents considered by the Secretary.

#### 6. Approval.

The thirty-seventh cause of action is based upon the assumption that the 4(f) statement was invalid for failure to contain sufficient information regarding non-highway alternatives. As discussed above, the 4(f) statement sufficiently addressed the no-build alternative. At trial, Defendants

---

**33.** It cannot be disputed that the City and County presently has sole jurisdiction over the Park. Thus, even if defendants should have coordinated the 4(f) statement with the Corps of Engineers, Plaintiffs would be without a remedy, since the proper agency for coordination is the City and County.

offered evidence that in reaching his decision, the Secretary considered, *inter alia*, (1) the Ho'omaluhia Park 4(f) Statement; (2) Vol. I of the 1972 EIS; Vol. I of the NHV-SEIS; and the FHWA Region 9 Staff Analysis. It thus cannot be concluded that the Secretary's decision was based upon inadequate information.

7. Feasible and Prudent Alternatives.

The forty-third through forty-sixth causes of action challenge the correctness of the Secretary's determination that no feasible and prudent alternative exists to the use of Ho'omaluhia Park.

It should be recalled that the two elements of the 4(f) statutes are that: (1) parklands cannot be used unless all alternatives to their use are infeasible and imprudent; and (2) if parklands must be used, the Secretary must select the feasible and prudent alternative which minimizes harm to the park.

■■■ An alternative route which does not use the park cannot be found to be imprudent unless there are truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reaches extraordinary magnitudes. *Id.* at 412, 91 S.Ct. at 821; *Louisiana Environmental Society, Inc. v. Coleman*, 537 F.2d 79, 84 (5th Cir. 1979).

An alternative route which uses the park may be rejected if it is infeasible or imprudent or does not minimize harm to the park. Two separate reasoning processes are involved here:

A route may be rejected because it does not minimize harm only for reasons relevant to the quantum of harm which will be done to the recreational area. If it does minimize harm, a route may be rejected only for truly unusual factors other than its effect upon the recreational area.

*Id.* at 86.

■■■ The Ho'omaluhia Park 4(f) statement considered five alternatives to the rec-

ommended alignment for the portion of H–3 in the vicinity of Ho'omaluhia Park: (1) Mauka Realignment (Scheme A); (2) Makai Realignment (Scheme B); (3) Partial Depressed Section; (4) Viaduct Section; and (5) No-Build. Of these, the the Makai Realignment, Partially Depressed Section, and No-Build alternatives would not have any impact upon Ho'omaluhia Park.[34] Plaintiffs assert that the Mauka Realignment, Makai Realignment, and No-Build alternative are feasible and prudent alternatives to the recommended alignment.

For the Mauka Realignment, the highway would be realigned approximately 500 feet away from the present boundary of Ho'omaluhia Park toward the mountain (mauka direction). The location of the Kaneohe and Halekou interchanges would be the same as in the recommended alignment. Due to the topography of the area, the roadway would be approximately 100 feet higher than in the recommended alignment. This alternative was rejected because:

[I]t would negate the originally intended purpose of the common boundary to eliminate · the urbanization of land between the park and H–3. To avoid urbanization of the resulting 92-acre tract, it is likely that the State may be required to purchase the land for inclusion in the park or the land may be purchased by the city or county. The result would again be a common boundary of the park and H–3 causing a "constructive use" Section 4(f) determination. In addition, it would require additional construction costs (approximately $6 million), cause increased noise above the ambient levels within the park because of the physical relationship of the highway and park elevations, be more visible from the park, take additional lands out of banana production, and move the highway closer to the Koolau Pali Natural Landmark.

Ho'omaluhia Park Section 4(f) Determination at 3.

---

**34.** The partially depressed section (partial cut and cover subalternative) would have cost approximately $66 million more than the recommended alignment. The Secretary could rea-

sonably have believed this to be a cost of extraordinary magnitude. Plaintiffs do not contend that this alternative is prudent.

For the Makai Realignment, the highway would be realigned makai, or to the ocean side, of Ho'omaluhia Park. It would follow the existing alignment of Likelike Highway and Kamehameha Highway on a viaduct structure from the Kaneohe Interchange to the Halekou Interchange. This alternative was rejected because:

[I]t would require the dislocation of one church, four businesses and 31 residences adjacent to Likelike and Kamehameha Highways; increase noise, air quality and visual impacts to residences in the general vicinity; require additional costs due to the need for the viaduct structure ($42 million additional); and require construction to lesser design geometric standards.

*Id.* at 3.

The described no-build alternative considered the effect of not constructing H-3 at all. This alternative was rejected because a no-build decision would:

[R]esult in additional traffic congestion and increased delays experienced by windward commuters. Likewise, the increased safety hazards on Likelike and Pali Highways would directly affect Kalihi Valley and Nuuanu Valley residents. The costs of providing increased bus service which will not effectively reduce the congestion on the existing highways have been documented in the supplement to the Interstate H-3 EIS.

At trial, plaintiffs suggested that another "no-build" alternative would be to not construct the portion of H-3 between the Kaneohe and Halekou interchanges. Defendants established that this alternative was essentially the same as the Makai realignment.

The final alternative suggested by plaintiffs is the so-called "direct line" realignment. This alternative was created by drawing a straight line from H-3 near Hospital Rock to Kamehameha Highway near Kaneohe School, totally ignoring considerations of traffic flow, safety and terrain. Plaintiffs did not introduce any evidence which suggested that this alternative might be viable. Defendants testified that due to the terrain of the area, such an alignment would require a viaduct structure between 100 and 200 feet high. It is obvious that even plaintiffs do not seriously believe that this alternative is feasible *or* prudent. Accordingly, further consideration of this alignment is unnecessary.

With respect to the first part of the 4(f) inquiry, I find that the Secretary reasonably believed that there are no feasible and prudent alternatives to the use of Ho'omaluhia Park.

As discussed earlier, defendants have sufficiently established the need for the highway. Rejection of the no-build alternative was thus reasonable.

The Makai Realignment was also properly rejected. Contrary to plaintiffs' contention, community impacts may be considered in determining the prudence of an alternative. While the displacements resulting from the Makai Realignment are not, by themselves, sufficient reason to justify the use of parkland, I find that the Secretary could reasonably have believed that the sum of the factors listed rendered this alternative imprudent. In particular, the Makai Realignment would necessitate reducing design speeds on the through route from 55 MPH to 30 MPH and require an unusually complex and unsafe ramp configuration. This is not to say that the Secretary is permitted to weigh the detriment resulting from the destruction of parkland against the cost of other routes, safety considerations and other factors. Such a balancing of interests is expressly prohibited by *Overton Park.* However, *Overton Park* does not bar considering whether all of the difficulties posed by an alternative route, taken together, render that alternative imprudent.

Since it appears that there are no feasible and prudent alternatives to the use of Ho'omaluhia Park, the remaining issue is whether the recommended alignment minimizes harm to the park.

Rejection of the Mauka Realignment was proper only if (1) it was not feasible and prudent, or (2) if it does not minimize harm. I find that there is insufficient information

in the record to support rejection on either of these grounds.

The possibility that the buffer zone between the highway and the park may be added to the park, again creating a constructive use, is a legitimate consideration in determining the prudence of this alternative, although in this matter, it is not a sufficient reason for rejection. As noted above, the park has expanded to meet the boundary of the project right-of-way. This situation was probably not contemplated by either the drafters of the 4(f) statutes, or the Court in *Overton Park*, which involved the proposed construction of a freeway *through* an important urban park. The removal of land from banana production is also a permissible consideration, but not determinative.

On the other hand, the 4(f) statement does not demonstrate that moving the freeway closer to the Koolau Pali Natural Landmark will have any adverse effects. Further, an increase in construction costs of $6 million is probably not a cost of "extraordinary magnitude". Finally, the fact that park noise levels will be higher with the highway than without it is irrelevant in determining the prudence of an alternative. I conclude that the Secretary could not have reasonably determined, on the basis of the information before him at the time, that the Mauka Realignment was not "feasible and prudent".

I conclude that the Secretary properly found that there are no feasible and prudent alternatives to the use of Ho'omaluhia Park. However, the Ho'omaluhia Park 4(f) determination fails to establish that the Secretary selected the feasible and prudent alternative which minimizes harm to the park. Although it is possible that because of its elevation the Mauka Realignment will have a greater visual impact upon the park than will the recommended alignment, the 4(f) statement does not adequately support the assertion that it would not minimize total harm to the park. The Secretary's 4(f) determination must therefore be set aside.

8. Planning to Minimize Harm.

█ The forty-first cause of action alleges that:

508. The Ho'omaluhia Park statement is deficient and fails to comply with the requirements of [23 C.F.R. § 771.19(k) (1980)] in that the 4(f) statement does not contain the *best available information* on possible measures to minimize harm from H–3 to Ho'omaluhia Park both during and after construction. [emphasis in original]

Complaint ¶ 508 at 108.

Except to the extent that the 4(f) statement fails to support the determination that the Recommended Alignment is a harm-minimizing route, I find that the information contained in the 4(f) statement is sufficient to meet the requirements of the cited regulation. More specific planning of mitigation measures will not be possible until the project reaches the final design phase.

*J. Section 4(f)—Pali Golf Course.*

█ In 1974, I held that the Secretary had properly made the 4(f) determination for the use of Pali Golf Course land. *Stop H–3 Association v. Brinegar*, 389 F.Supp. at 1116. Pursuant to the instructions of the Ninth Circuit, I now reconsider that decision.

Pali Golf Course is a 220 acre, 18 hole golf course located at the foot of the Nuuanu Pali Lookout. It is considered one of the most challenging public courses on the island and is heavily used. The northeast side of the golf course borders on Kamehameha Highway.

As presently planned, the SE ramp of the Halekou interchange and the acceleration lane connecting the SE ramp with Kamehameha Highway will necessitate the acquisition of approximately four acres of golf course land at the northwest end of the course. Much of the land to be acquired is subject to periodic flooding and is considered surplusage to the needs of the course. The Pali Golf 4(f) statement described and discussed three alternatives to

the recommended action, and recommended that they be rejected, as follows:

Alternate 1—shifting the Halekou Interchange northerly into Hawaiian Electric Company's Koolau Substation. This alternate was rejected because it would involve costly adjustments to electrical facilities, such as steel towers and high-tension lines. Such a shift would also encroach a great deal more into Hawaiian Memorial Park. Where our recommended location involves unused property on a slope, a northerly shift would run the highway through developed portions of the cemetery. It should also be noted that construction is progressing on the segment of H-3 immediately to the east of Halekou interchange, and any extensive realignment to Halekou Interchange will necessitate construction changes. As mentioned before, the affected golf course properties are presently unused, and realignment of Halekou Interchange will not provide any benefit to the golf course.

Alternate 2—revising the interchange geometrics to provide a loop off-ramp directly opposite the golf course on Hawaii Loa property. ... Such an arrangement will be more costly by approximately $145,000 and constitute a much greater encroachment into Hawaii Loa College. This proposal is also objectionable from an operational standpoint because it would introduce an undesirable weaving section to Kamehameha Highway.

Alternate 3—providing a T-intersection where the SE and SW Ramps meet Kamehameha Highway. This proposal has the advantage of eliminating the acceleration land onto Kamehameha Highway, thereby making the acquisition of golf course land along the Kamehameha Highway frontage unnecessary. However, this alternate is operationally unacceptable because the T-intersection will not have the capacity for the projected 800 vehicles per hour of P.M. traffic desiring to make a right turn onto Kamehameha Highway.

Pali Golf Course 4(f) statement at 5–6.

I find that the Secretary reasonably rejected alternates one and three as not feasible and prudent. It is apparent that Alternate 1, the northward shift of the interchange, would increase the project's impacts upon Ho'omaluhia Park. Thus, even if I did find that the reasons stated for the rejection of this proposal were inadequate, I would conclude that this alternative was not feasible and prudent. Moreover, I find that encroachment into the developed portions of Hawaiian Memorial Park is of sufficient importance that rejection on this ground alone would have been reasonable. With respect to Alternative 3, I find that the Secretary had enough information before him to conclude that a T-intersection would be operationally unacceptable.

The Pali Golf Course 4(f) statement fails to support the rejection of Alternate 2, revised interchange geometrics. $145,000 is not a cost of extraordinary magnitude, especially in comparison to a total project cost of over $386 million. While it may indeed be regrettable that this alternative will require the taking of property from Hawaii Loa College, there has been no evidence that this taking would entail a disruption of sufficient magnitude to render the alternative imprudent. Finally, there has been no evidence that to "introduce an undesirable weaving section to Kamehameha Highway" is an unusual factor justifying rejection of the alternative. Even taking all three factors together, I find that on the basis of the record before me, the Secretary could not have reasonably believed that this alternative is imprudent.

As with Ho'omaluhia Park, the inquiry does not end with the determination that there are no feasible alternatives to the use of the 4(f) property. The Secretary must select the alternative which minimizes harm to the park. On the basis of the record before me, I cannot conclude that this has been done. The Pali Golf Course 4(f) statement does not adequately describe the relative impacts of the different alternatives upon the Golf Course. Indeed, the statement fails to even disclose the relative amounts of 4(f) land required. I conclude

that the Secretary's 4(f) determination for the Pali Golf Course must be set aside.[35, 36]

## VI. SUMMARY.

A brief summary of the disposition of the major issues of this case is in order. I find that the 1972 EIS and 1973 Preface, *i.e.*, the Moanalua Valley EIS, complied with the requirements of NEPA, the CEQ Guidelines and the DOT Regulations, and were properly approved. Thus, as of the end of the 1974 trial of this matter, the project had a valid EIS. Defendants were required to prepare a supplemental EIS to reflect the realignment of the project through North Halawa Valley. This has been done. The NHV–SEIS was properly prepared and circulated, and adequately discusses the project's impact upon North Halawa Valley. As a whole, the EIS for the project sufficiently addresses the project's socio-economic impacts and relationship to the Oahu General Plan. However, defendants have failed to prepare a further supplemental EIS which reflects the new and significant information (such as the H–3/OMEGA Collocation studies, the FHWA Region 9 Staff Analysis and the highway's 4(f) involvement with Ho'omaluhia Park), which has arisen since the draft NHV–SEIS was circulated.

Defendants properly held combined location and design hearings, timely filed the required study reports, and complied with the Coastal Zone Management Act and OMB Circular A–95 coordination requirements. Defendants have also met their responsibilities with respect to the Federal and State Endangered Species Acts.

The protections of section 4(f) apply to Ho'omaluhia Park. The defendants properly coordinated and prepared the Ho'omaluhia Park 4(f) statement, but failed to properly circulate it. The 4(f) statement contains sufficient information to comply with 23 C.F.R. § 771.19(i) and (k) (1980), and

adequately considers non-highway alternatives. The Secretary properly concluded that no feasible and prudent alternatives exist to the use of the park. However, the 4(f) statement does not adequately support the finding that all possible measures have been taken to minimize harm to the park. The Secretary's determination is thus invalid.

The Secretary's Pali Golf Course 4(f) determination is invalid because the record does not adequately support the conclusion that all possible measures have been taken to minimize harm to the golf course.

Because the defendants failed to further supplement the EIS, and because the Secretary's Pali Golf Course and Ho'omaluhia Park 4(f) determinations were invalid, I must set aside the Secretary's grant of location and design approval as an action taken without observance of procedure required by law. Administrative Procedure Act, 5 U.S.C. § 706(2)(D) (1977). *See Save Lake Washington v. Frank*, 641 F.2d at 1334. Since the most recent location and design hearings were held more than three years ago, defendants must again hold such hearings before location and design approval may be validly granted. *See* 23 C.F.R. §§ 790.5(e), (f).

## VII. RELIEF.

A court of equity has the power to terminate or modify any injunctions that it has imposed. The original injunctions in this matter are nine and ten years old. I find that circumstances have changed sufficiently to justify terminating those injunctions and ordering new relief. At present, there are no outstanding construction contracts for the project. Indeed, even if I were to give the "all clear" today, actual construction would not begin for at least twelve months. *See* Location/Design Study Report at 12. Thus, little, if any, harm to the

---

**35.** I do not mean to imply that the Secretary may not reject Alternate 2. I only find that the record contains insufficient information to support such a conclusion.

**36.** Because the Pali Golf Course 4(f) statement was prepared and originally approved prior to the adoption of the original DOT 4(f) regulations, 23 C.F.R. § 771.19 (1974), the statement need not comply with the circulation and content requirements of the regulations.

public will result if the injunctions are lifted. Further, I do not share the opinion of many freeway opponents that Federal and state highway department officials are evil people intent on ignoring the law. As stated in *Overton Park*, the decision of the Secretary is entitled to a presumption of regularity. *See id.* at 415, 91 S.Ct. at 823. To require the defendants to receive court approval before proceeding would improperly shift this presumption. Although it is certainly possible that defendants may fail to comply with their statutory responsibilities at some point in the future, a determination whether an injunction should issue should be made at that time. Accordingly,

(1) I hereby set aside the injunctions presently in force.

(2) I hereby deny Defendants' Motion for Reconsideration.

(3) I hereby set aside the Secretary's grant of location and design approval for the project.

(4) Defendants failure to prepare and circulate a supplemental EIS which reflects the project's Ho'omaluhia Park 4(f) involvement and the information contained in the H–3/OMEGA Collocation Studies and FHWA Region 9 Staff Analysis is a violation of NEPA, 40 C.F.R. § 1502.9(c)(4) (1980), and 23 C.F.R. § 771.15 (1980). A supplemental EIS addressing these issues may include other studies, such as those contained in Vol. VI of the NHV–SEIS, and other information. Further, the NHV–SEIS, Ho'omaluhia Park 4(f) statement and Region 9 Staff Analysis may be used as a basis for the draft of this document. However, the role of consultants in the further development of the draft supplemental EIS is limited by 23 C.F.R. § 771.109(c)(4) (1981).

(5) I hereby set aside the Secretary's Ho'omaluhia Park 4(f) determination. The Ho'omaluhia Park 4(f) statement does not sufficiently discuss the relative impacts of the Recommended Alignment and the Mauka Realignment upon the park. A revised 4(f) statement may reflect additional information about the park which has become available since the original statement was filed, and further discuss alternatives other than the Mauka Realignment. After the revised statement has been circulated and processed, a new 4(f) determination for Ho'omaluhia Park will be made by the Secretary.

(6) I hereby remand the Pali Golf Course 4(f) determination to the Secretary for further documentation that no feasible and prudent alternatives exist to the use of the golf course lands and all possible measures to minimize harm to the golf course have been taken.

The above constitute the findings of fact and conclusions of law required by Fed.R. Civ.P. 52.

SO ORDERED.